

**IT IS ORDERED as set forth below:**

**Date: August 9, 2019**

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | : | CASE NO. **19-52577-PMB** |
| | : | |
| **GMI GROUP, INC.,** | : | CHAPTER 11 |
| | : | |
| Debtor. | : | |
| | : | |
| **GMI GROUP, INC.,** | : | |
| | : | |
| Plaintiff, | : | ADVERSARY PROCEEDING |
| | : | |
| v. | : | NO. **19-5137** |
| | : | |
| **RELIABLE FAST CASH, LLC,** | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |

### ORDER (I) GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
### JUDGMENT (II) DENYING DEBTOR'S MOTION FOR SUMMARY JUDGMENT

This matter (the "Adversary Proceeding") comes before the Court on cross motions for

summary judgment (Docket Nos. 23 & 28) filed by the Plaintiff-Debtor (the "Debtor") and

Defendant Reliable Fast Cash, LLC ("Defendant"). In Defendant's *Motion for Summary Judgment*

(Docket No. 23)(the "RFC Motion") filed May 17, 2019, Defendant seeks summary judgment as

to all counts asserted in the *Verified Complaint (1) Seeking Injunction; (2) Objecting to Claim;*

*(3) Recovering Prepetition Transfers; and (4) Seeking Other Relief* (Docket No. 1)(the

"Complaint") that initiated this Adversary Proceeding.[1]   In the Debtor's *Motion for Summary*

*Judgment on Counts I and III* (Docket No. 28)(the "Motion for Summary Judgment") filed May

20, 2019, the Debtor seeks summary judgment as to Counts I and III asserted in the Complaint; or,

in the alternative, a determination that there are genuine disputes of material facts.[2]   For the reasons

set forth below, the RFC Motion is granted in part and denied in part, and the Motion for Summary

Judgment is denied.

## BACKGROUND

### I. Pre-Bankruptcy History

The genesis of this Adversary Proceeding is an "Agreement for the Purchase and Sale of

Future Receivables" (the "Agreement")(Docket No. 26-2, pp. 5-11) dated August 10, 2018, in

which the Debtor agreed to sell its future receipts to Defendant in exchange for an immediate cash

advance (such an agreement is known generally as a "merchant cash advance agreement").

---

[1] Defendant supplemented the RFC Motion with: (i) a *Brief in Support of Motion for Summary Judgment* (Docket No. 24); (ii) a *Statement of Undisputed Facts* (Docket No. 25); (iii) an *Affidavit of Jeffrey Zachter* (Docket No. 26-1); (iv) an *Affidavit of Confession of Judgment* (Docket No. 26-2); and (v) Defendant's Proof of Claim (the "Proof of Claim") and supporting documents filed in the underlying bankruptcy case as Claim No. 2 (Docket No. 26-3). Defendant filed a response to the Motion for Summary Judgment in the form of the following: (i) a *Memorandum of Law in Opposition to Motion for Summary Judgment by Plaintiff* (Docket No. 33); (ii) a *Counter-Statement of Material Facts in Opposition to Summary Judgment by Plaintiff* (Docket No. 34); and (iii) a *Reply to Plaintiff's Reply to Defendant's Motion for Summary Judgment and Defendant's Reply to Plaintiff's Motion for Summary Judgment* (Docket No. 35).  All of these pleadings were considered in connection with this Order.

[2] The Debtor supplemented the Motion for Summary Judgment with: (i) a *Memorandum of Law Supporting Plaintiff's Motion for Summary Judgment* (Docket No. 29); (ii) a *Supporting Affidavit of Kayla Dang* (Docket No. 30); and (iii) a *Statement of Material Facts in Support of Plaintiff's Cross-Motion for Summary Judgment* (Docket No. 31).  In response to the RFC Motion, the Debtor filed: (i) a *Plaintiff's Reply to Defendant's Motion for Summary Judgment* (Docket No. 32-1); (ii) a *Memorandum of Law Supporting Plaintiff's Response to Defendant's Motion for Summary Judgment* (Docket No. 32-2); and (iii) a *Response to Defendant's Statement of Undisputed Facts* (Docket No. 32-3). The Debtor also filed its *Reply in Support of Its Motion for Summary Judgment* (Docket No. 36) and *Response to Defendant's Additional Facts in Opposition to Summary Judgment* (Docket No. 37).  All of these pleadings were considered in connection with this Order.

Pursuant to the Agreement, the Debtor sold $210,000.00 (the "Purchased Amount") of its future

receipts (the "Future Receipts") to Defendant in exchange for a purchase price of $150,000.00 (the

"Purchase Price").  In exchange for Defendant's immediate payment of the Purchase Price, the

Debtor agreed to allow Defendant to collect the Purchased Amount through daily debits from a

specified bank account of the Debtor in the amount of $1,400.00 (the "Daily Amount"), which

Daily Amount is 5 percent (the "Specified Percentage") of the Debtor's anticipated daily Future

Receipts, until the Purchased Amount is paid in full.  The Daily Amount is calculated in the

Agreement by multiplying the Debtor's average monthly sales (estimated at $650,000.00) by the

Specified Percentage and then dividing that figure by the average number of business days in a

calendar month.

The Agreement provides that the transaction is not a loan, but merely a sale of a portion of

the Debtor's future receipts at a discount to Defendant:

> [Debtor] is selling a portion of a future revenue stream to [Defendant] at a discount,
> not borrowing money from [Defendant] and is solely for business purposes and not
> for personal, family or household purposes.  There is no interest rate or payment
> schedule and no time period during which the Purchased Amount must be collected
> by [Defendant].

*Id*. at 2.  The Agreement further states that Defendant's purchase of the Future Receipts is with the

risk that the Debtor's business may decline, fail, or end up in bankruptcy, and that Defendant

assumes such risk based on the Debtor's representations, warranties, and covenants contained in

the Agreement:

> If Future Receipts are remitted more slowly than [Defendant] may have anticipated
> or projected because [Debtor's] business has slowed down, or if the full Purchased
> Amount is never remitted because [Debtor's] business went bankrupt or otherwise
> ceased operations in the ordinary course of business, and [Debtor] has not breached
> this Agreement, [Debtor] would not owe anything to [Defendant] and would not be
> in breach of or default under this Agreement.  [Defendant] is buying the Purchased
> Amount of Future Receipts knowing the risks that [Debtor's] business may slow
> down or fail, and [Defendant] assumes these risks based on [Debtor's]

> representations, warranties and covenants in this Agreement that are designed to give [Defendant] a reasonable and fair opportunity to receive the benefit of its bargain.

*Id.* The Agreement also allows both parties to reconcile the Daily Amount that Defendant can debit from the Debtor's bank account to more accurately reflect the Debtor's actual Future Receipts:

> The Initial Daily Amount is intended to represent the Specified Percentage of [Debtor's] daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, [Debtor] may request, in writing, that [Defendant] adjust the Daily Amount to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . No more often than once a month, [Defendant] may adjust the Daily Amount on a going-forward basis to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

*Id*.

Events of Default are defined in the Agreement as follows:

> (a) [Debtor] interferes with [Defendant's] right to collect the Daily Amount;

> (b) [Debtor] or Guarantor(s) violates any term or covenant of this Agreement;

> (c) [Debtor] uses multiple depository accounts without the prior written consent of [Defendant];

> (d) [Debtor] changes its depositing account or its payment card processor without the prior written consent of [Defendant];

> (e) [Debtor] defaults under any of the terms, covenants and conditions of any other agreement with [Defendant] and/or [Defendant's] Affiliate ACH Capital, LLC;

> (f) [Debtor] fails to provide timely notice to [Defendant] such that in any given calendar month there are four or more ACH transactions attempted by [Defendant] are rejected by [Debtor's] bank;

> (g) Any representation or warranty by [Debtor] in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

> (h) The sending of notice of termination by [Debtor];

> (i) The [Debtor] fails to give [Defendant] 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the specific daily amount

4

will not be honored by [Debtor's] bank, and [Debtor] fails to supply all requested documentation and allow for daily monitoring of its bank account; and

(j) [Debtor] shall default under any of the terms, covenant and conditions of any other [language of this section ends here]

*Id* at 5.

If an Event of Default occurs, the following remedies apply:

17.1 The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

17.2 [Defendant] may enforce the provisions of the Personal Guaranty of Performance against each Owner.  Guarantor(s) will be jointly and severally liable to RFC for all of RFC's losses and damages, in additional [sic] to all costs and expenses and legal fees associated with such enforcement.

17.3 [Defendant] may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which [Defendant] shall recover Judgment against [Debtor], [Debtor] and Guarantor(s) shall be liable for all of [Defendant's] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

17.4 This Agreement shall be deemed [Debtor's] Assignment of [Debtor's] Lease of [Debtor's] business premises to [Defendant]. Upon an Event of Default, [Defendant] may exercise its rights under this Assignment of lease without prior notice to [Debtor].

17.5 [Defendant] may debit [Debtor's] depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on [Debtor's] bank account or otherwise for all sums due to [Defendant].

17.6 [Debtor] shall pay to [Defendant] all reasonable costs associated with the Event of Default and the enforcement of [Defendant's] remedies, including but not limited to court costs and attorneys' fees.

17.7 [Defendant] may exercise and enforce its rights as a secured party under the UCC.

17.8 In case any Event of Default occurs and is not waived pursuant to Section 16 hereof, [Defendant] may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of [Debtor's] obligations hereunder (include the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of [Defendant] in

5

> connection with this Agreement may be exercised at any time by [Defendant] after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

*Id*. at pp. 5-6.

The Debtor's principal, Kayla Dang ("Ms. Dang"), personally guaranteed the Debtor's performance under the Agreement (the "Guaranty")(Main Bankruptcy Case Claims Register, Claim No. 2, Attachment 3, pp. 10-11). The Guaranty provides that Ms. Dang "will not be personally liable for any amount due under this Agreement unless [Debtor] commits an Event of Default pursuant to Section 16 of the Purchase and Sale of Future Receivables Agreement." *Id*. at 11. Defendant was also granted a security interest in the collateral enumerated in the Agreement in Section 15.1 and was authorized to file a UCC-1 financing statement evidencing its security interest therein. Agreement, p. 5. The filed financing statement is included in Defendant's Proof of Claim No. 2 as Attachment 2.

## II. The Adversary Proceeding

In the Complaint, the Debtor asserts the following counts: (i) Count I for criminal usury under New York law regarding the Agreement ("Count I"); (ii) Count II for unjust enrichment ("Count II"); Count III for avoidance and recovery of preferential transfers under 11 U.S.C. §§ 547 and 550 ("Count III"); (iv) Count IV for avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550 ("Count IV"); (v) Count V for declaratory judgment as to the validity, priority, and extent of security interests ("Count V"); (vi) Count VI for an objection to Defendant's claim filed in the underlying bankruptcy case; (vii) Count VII for unconscionability ("Count VII"); and Count VIII for emergency temporary restraining order, preliminary injunction and permanent relief.[3]

---

[3] This count was also asserted by the Debtor in an *Emergency Motion for Temporary Restraining Order and Preliminary and Permanent Injunction and Request for Expedited Hearing* (Docket No. 2)(the "Emergency Motion"),

The Debtor contends in the Complaint that Defendant obtained a confession of judgment against the Debtor on November 14, 2018 in a New York state court (the "Confessed Judgment")(Main Bankruptcy Case Claims Register, Claim No. 2, Attachment 2).  The Debtor asserts that, in conjunction with executing the Agreement, Ms. Dang executed an affidavit of confession of judgment which was then used by Defendant to obtain the Confessed Judgment (Docket No. 26-2, p. 1)(the "Affidavit of Confession of Judgment").

The Confessed Judgment is in the amount of $177,514.00, which is comprised of the Purchase Amount ($210,000.00) minus payments received ($77,000.00); attorney's fees in the amount of $44,289.00; and miscellaneous fees and costs in the amount of $225.00.  The Debtor contends that, in addition to the $77,000.00 in payments made as set forth in the Confessed Judgment, it also made additional payments in the amount of $11,200.00, for a total of $88,200.00 in payments made under the Agreement.  The Debtor asserts that Defendant also obtained a garnishment in December 4, 2018 in the amount of $35,660.96.  Thus, the Debtor contends that it has paid a total of $123,860.96 to Defendant under the Agreement.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment may be granted pursuant to Federal Rule of Civil Procedure 56, made applicable herein by Federal Rule of Bankruptcy Procedure 7056, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).[4]  In deciding a motion for summary judgment, the court "is not . . . to

---

filed on March 6, 2019.  The Emergency Motion was addressed in an *Order (I) Granting in Part Debtor's Emergency Motion, (II) Imposing Preliminary Injunction, and (III) Setting Further Hearing* (Docket No. 14)(the "Prior Order"). Because Count VIII has been addressed by the Prior Order (and is not raised in the RFC Motion or Motion for Summary Judgment), it will not be addressed in this Order.

[4] In determining the materiality of facts, "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).  A genuine factual dispute exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 248, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The initial burden of proving the absence of dispute as to any material fact rests with the moving party.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In meeting this initial burden, the moving party must identify "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (internal quotations omitted).  Once the party moving for summary judgment has identified those materials demonstrating the absence of a genuine issue of material fact, the non-moving party cannot rest on mere denials or conclusory allegations, but must go beyond the pleadings and designate, through proper evidence such as by affidavits or personal knowledge or otherwise, specific facts showing the existence of a genuine issue for trial.  *See* Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Fleet Finance Inc.*, 4 F.3d 946, 948-49 (11th Cir. 1993); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).  Further, all reasonable doubts should be resolved in favor of the non-moving party, and "[i]f reasonable minds could differ on any inferences arising from undisputed facts, summary judgment should be denied." *Twiss v. Kury*, 25 F.3d 1551, 1555 (11th Cir. 1994)(citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

## II. Count I (Criminal Usury)

### a. The Parties' Arguments

Count I of the Complaint is for criminal usury under New York law.  In Count I, the Debtor asserts that the Court should find that the Agreement constitutes a criminally usurious loan, that the Agreement is *void ab initio*, and that, as a penalty, Defendant must sacrifice the principal and interest on the Agreement.  Further, the Debtor asserts that the following additional relief should be awarded to it: (i) the Court must vacate the Confessed Judgment wherever it has been entered; (ii) the Court must void the related documents included with the Agreement, including cancelling the UCC-1 financing statement; (iii) the Court must declare the Agreement an illegal loan and debt under New York law; (iv) the Court must enjoin the collection of the underlying debt arising from the Agreement, including (but not limited to) the principal debt on the Agreement and Guaranty; (v) the Court should require Defendant to turn over to the Debtor all amounts paid under the Agreement, in an amount not less than $123,860.96, as property of the estate plus penalties and attorney's fees; and (vi) the Court should declare Defendant adequately protected in the underlying Chapter 11 case due to its receipt of $123,860.96 in prepetition payments on a cash advance of $150,000.00, such that no further adequate protection payments are necessary "until the lien is declared to be valued at $0.00 at which point Debtor should be released from any obligation to provide adequate protection to Defendant."  Compl. ¶ 21.

Defendant has moved for summary judgment as to Count I on the ground that applicable New York law precludes a finding of criminal usury because the Agreement is not loan, but rather is a sale of the Debtor's future receivables—a valid transaction under the laws of New York and the Uniform Commercial Code.[5]  Defendant notes that to be subject to the applicable usury statute,

[5] Defendant also contends that all other counts of the Complaint are derivative of Count I , and thus should also be resolved on summary judgment.

9

the agreement must first be found to constitute a loan.  Thus, Count I turns entirely on whether the Agreement is a loan (subject to usury) or a sale of future receivables (not subject to usury). Defendant also asserts that under New York law, criminal usury can only be brought by a corporation as a defense to repayment.  Given that Count I is being asserted as an affirmative claim by the Debtor, Defendant argues that the Debtor—as a corporation—is precluded from asserting Count I in the Adversary Proceeding.

Defendant also addresses the substance of the Agreement and applicable New York state court cases analyzing merchant cash advance agreements and whether they constitute loans or sales of receivables.  Defendant contends that, to constitute a loan, the underlying obligation must be repayable absolutely under all circumstances.  Defendant cites to several New York cases in which it contends that merchant cash advance agreements, like the Agreement here, are held not to be loans because nonpayment by the merchant does not constitute default.   If an agreement provides for a contingent return, Defendant argues, then it is not absolutely repayable and does not constitute a loan.  Under traditional merchant cash advance agreements, the contract is structured in such a way that the buyer's collection of its purchase price is contingent upon the seller collecting its future receivables.  If the seller collects its receivables more slowly than anticipated, or ceases operations all together, then the seller will not be in default under the agreement and will owe the buyer nothing.  Instead, the seller is only obligated to repay the purchased amount if it breaches certain warranties and covenants related to the buyer's access to the seller's accounts or the seller's interference with the buyer's ability to debit the daily amounts under the agreement.

In that regard, Defendant contends that the Agreement in this case is identical to other agreements found by New York courts to constitute valid sales of future receivables and not loans. Defendant asserts that under the Agreement, it bore the risk that the Debtor may never repay the

Purchased Amount because non-payment is not a default event that would trigger the Debtor's or Ms. Dang's obligation to pay the Purchased Amount.[6]  The Agreement explicitly provides that if Future Receipts are remitted more slowly than anticipated, or if the Purchased Amount is never repaid because the Debtor's business ceases operations in the ordinary course, then Debtor would not be in breach of the Agreement and would not owe anything to Defendant.  Moreover, bankruptcy is specifically excluded in the Agreement as an event of default.  Because the Agreement lacks the essential elements of a loan (chiefly, absolute repayment), Defendant contends that the Agreement is a valid sale of the Debtor's future receivables and therefore not subject to applicable usury law.

The Debtor also moves for summary judgment as to Count I on the basis that the Agreement is a loan and not a sale of receivables.  The Debtor contends that if found to constitute a loan, the interest charged under Agreement violates the New York criminal usury statute.  Like Defendant, the Debtor notes that the threshold issue on its criminal usury claim is whether the Agreement is a loan.  The Debtor also states that, to constitute a loan, the obligation must be absolutely repayable. Upon consideration of the terms of the Agreement, coupled with the Guaranty and the Confessed Judgment, the Debtor argues that Defendant incurred no risk of not receiving payment of the Purchased Amount.  Rather, the Debtor asserts that the Agreement is a loan cloaked as a sale of the Debtor's receivables in an effort to skirt the applicability of New York's usury statute.

As to the actual terms of the Agreement, the Debtor cites to the following language as evidence that Defendant always intended to be repaid in full: "[Debtor] will conduct its business in good faith and will use its best efforts to continue its business at its current level, *to ensure that Buyer obtains the Purchased Amount*."  Agreement, Section 14.1, p. 3 (emphasis added).  The

---

[6] Defendant further notes that the existence of a guarantor in the context of a merchant cash advance agreement does not transform the agreement into a loan.

Debtor argues that Defendant built in other financial guarantees into the Agreement to ensure that the principal sum would be repaid absolutely: the Guaranty and Confessed Judgment.  Not only does the Guaranty protect Defendant and serves as a mode to ensure repayment, the Debtor contends that the Affidavit of Confession of Judgment Ms. Dang was forced to execute in order to enter into the Agreement also ensures repayment.  The Debtor argues that the fact that the Affidavit of Confession of Judgment was required at the inception of the Agreement serves as an admission by Defendant that it absolutely expected to receive the full Purchased Amount.

The Debtor also explains that language in the Agreement's "Delivery of Purchase Amount" provision of Section 1, when construed with the "Events of Default" and "Remedies" provisions of Sections 16 and 17, eliminate any risk that Defendant will not be repaid in full.  To that end, the Debtor notes the following:

> Section 1 states that GMI is responsible for ensuring that the Daily Amount is available in the Account each business day. Section 16(e) states that "[GMI's default] under any of the terms, covenants and conditions of any other agreement with [Reliable] and/or [Reliable's] Affiliate ACH Capital, LLC" constitutes as an "Event of Default". Furthermore, Section 17.1 states that if any Event of Default occurs, Reliable may proceed to protect and enforce its rights including changing the specified percentage to 100% and collecting the full uncollected principal amount paid plus all fees and charges (including legal fees) due under the Agreement, immediately. To that end, Reliable cannot imply that nonpayment was not an event of default when Reliable is authorized to debit GMI's account, and GMI's failure to have the Daily Amount in its account is an Event of Default in which Reliable can collect all of the principal amount paid from both GMI, and from its Guaranty, along with a Confessed Judgment offering no opportunity for dispute to GMI.

Mot. Summ. J., pp. 7-8.  Accordingly, the Debtor contends that these provisions operate to guarantee repayment of the full Purchased Amount.

The Debtor also asserts that the Agreement is not a true accounts receivable transaction in which the factor is actually handling the collection of the accounts receivable and bearing the incidental risk of nonpayment.  Instead, the Debtor argues that the Agreement is a one-time cash

infusion, secured by a UCC-1 in the Debtor's accounts receivable, that is being repaid by the Debtor on a daily basis; in other words, the Agreement is, in essence, a loan.

If the Agreement is found to constitute a loan, the Debtor argues that the interest rate exceeds the threshold for a criminally usurious loan, the Agreement must be declared void *ab initio*, and all funds paid by the Debtor to Defendant must be ordered to be remitted back to the Debtor.

### b. Applicable Law & Analysis

Both parties agree that New York law applies to this dispute and the Court's interpretation of the Agreement.[7]  The laws of the state of New York provide for both civil and criminal usury. *EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 U.S. Dist. LEXIS 26141, at *14 (S.D.N.Y. Feb. 19, 2019).  Corporations, however, cannot assert claims for civil usury.  *Id.* at *15 (citing  N.Y. Gen. Oblig. Law § 5-521(1)).  Corporations can, however, assert criminal usury as a defense.  Pursuant to New York's criminal usury statute:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

N.Y. Penal Law § 190.40.  Accordingly, New York's criminal usury statute prohibits a party from knowingly charging interest on a loan in excess of 25 percent per annum.

Corporations are also barred from asserting affirmative claims for criminal usury; rather, they are limited to asserting criminal usury as a defense to repayment.  *See* N.Y. Gen. Oblig. Law § 5–521(3)(creating an exception to subsection (1) by permitting corporations to "interpose[ ] a *defense* of criminal usury as described in section 190.40 of the penal law.")(emphasis added). Consequently, corporations are barred from seeking "affirmative monetary relief" under Section

---

[7] Further, Section 21 of the Agreement provides that it shall be governed and construed pursuant to New York law. Agreement, p. 6.

190.40.  *Zoo Holdings, LLC v. Clinton*, 11 Misc.3d 1051(A), 2006 WL 297730, at *4 (N.Y. Sup. Ct. Jan. 24, 2006) (". . . insofar as the complaint seeks affirmative monetary relief, plaintiff improperly attempts to use a shield created by the Legislature as a sword.").  In *Zoo Holdings*, the corporate borrower sought a declaration that securities offerings were not transactions but were actually usurious loans, as well as related monetary relief.  *Id.*  The Court found that such affirmative relief is not available to corporations; rather, the statutory exception created by GOL 5-521(3) to extend the reach of Section 190.40 to corporations only applies where criminal usury is used as an affirmative defense to an action seeking repayment of the underlying obligation.  *Id.* at 4-5; *see also Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017), *citing Scantek Medical Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) ("Although corporations like plaintiff can assert criminal usury as a defense, they cannot bring civil claims under the criminal statute."); *Wilkinson Floor Covering, Inc. v Cap Call, LLC*, 59 Misc. 3d 1226(A), 2018 WL 2293196, at *3 (N.Y. Sup. Ct. May 16, 2018)(noting that in civil actions, a corporation is precluded from asserting a claim for usury); *K9 Bytes, Inc. v. Arch Capital Funding*, 56 Misc. 3d 807, 815 (N.Y. Sup. Ct. 2017)(explaining that "[i]t has long been settled in this state that criminal usury may only be asserted as a defense by a corporation, and never as a means to seek affirmative relief.").

Defendant argues that the Debtor is asserting an affirmative claim for criminal usury pursuant to Count I, which is prohibited by applicable law.  However, construing Count I and VI of the Complaint together, it appears that the Debtor is asserting the criminal usury claim in part as a defense to payment of Defendant's claim filed in the underlying bankruptcy case.  Under Count VI of the Complaint, the Debtor objects to the claim of Defendant on various grounds, including 11 U.S.C. § 502(b)(1), which permits disallowance where a claim is unenforceable under applicable

14

law.  Here, the Debtor seeks a determination that the Agreement is illegal and criminally usurious under New York law.  When construed with Count I, it is clear that the Debtor, by way of Counts I and VI, is raising the criminal usury claim in this Adversary Proceeding as a way to object to allowance and payment of Defendant's claim in this bankruptcy case.  Accordingly, the Debtor's assertion of criminal usury, to the extent the Debtor utilizes such assertion as a defense to repayment of Defendant's claim, is procedurally proper under applicable New York law.[8]

To succeed on the defense of criminal usury, there must exist a loan or forbearance. Criminal usury does not apply to a purchase and sale of receivables:

> The rudimentary element of usury is the existence of a loan or forbearance of money. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be.

> When determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it. Whether a transaction constitutes a cover for usury is a question of fact.

> In order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender.

*Colonial Funding Network, supra*, 252 F. Supp. 3d at 280-81 (internal citations and quotations omitted).  To constitute a true loan, "it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *K9 Bytes*, 56 Misc.3d at 816 (quoting *Rubenstein v. Small*, 273 App.Div. 102, 104, 75 N.Y.S.2d 483 (1st Dept.1947)).

---

[8] All other forms of affirmative relief the Debtor seeks in Count I are improperly asserted, as corporate entities like the Debtor may only assert criminal usury under New York law as a defense to repayment, and are dismissed on that basis (in addition to the bases described below).

Under New York law, there is a presumption against finding an agreement usurious.  *See Wilkinson Floor Covering*, 2018 WL 2293196, at *3.  Accordingly, "claims of usury must be proven by clear and convincing evidence, a much higher standard than the usual preponderance."  *K9 Bytes*, 56 Misc.3d at 816 (citing *Giventer v. Arnow*, 37 N.Y.2d 305, 309, 372 N.Y.S.2d 63, 333 N.E.2d 366 (1975)).  When repayment on the underlying transaction is contingent, the agreement is valid even where it provides for a return greater than the applicable legal rate of interest.  *IBIS Capital Group, LLC v. Four Paws Orlando, LLC*, 2017 N.Y. Misc. LEXIS 884, at *2, 2017 NY Slip Op 30477(U) (N.Y. Sup. Ct. March 16, 2017); *see also Colonial Funding Network*, 252 F. Supp. 3d at 281 (noting that unless the principal amount advanced is repayable absolutely, there can be no defense of usury).

The subject of merchant cash advance agreements and whether they constitute loans or sales of future receivables has been considered by several New York state courts.  *See Rapid Capital Finance, LLC v. Natures Market Corp.*, 57 Misc.3d 979, 982 (N.Y. Sup. Ct. 2017)(collecting cases); *see also K9 Bytes*, 56 Misc.3d at 816 ("Many trial courts have examined [merchant cash advance] agreements in the last several years, and have largely determined that most of them are not loans, but purchases of receivables.")(citing cases); *NY Capital Asset Corp. v. F & B Fuel Oil Co., Inc.*, 58 Misc.3d 1229(A), at *6 (N.Y. Sup. Ct. 2018)(". . . purchases and sales of future receivables and sales proceeds. . . are common commercial transactions expressly contemplated by the Uniform Commercial Code.").  Recent decisions evaluating whether merchant cash advance agreements are sales or loans cite to certain factors to determine whether the transaction provides for absolute or contingent repayment.  *See, e.g., IBIS Capital Group*, 2017 N.Y. Misc. LEXIS 884, at *6-11; *K9 Bytes*, 56 Misc.3d at 816-18; *NY Capital Asset Corp.*, 58 Misc.3d 1229(A), at *7-8.

16

The first factor is the existence of a reconciliation provision.  A reconciliation provision allows for adjustments of the daily withdrawal amounts based upon the seller's actual collection of future receivables:

> The reconciliation provisions allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less, and will receive a refund of anything taken by the company exceeding the specified percentage (which often can also be adjusted downward). If the merchant is doing well, it will pay more than the daily amount to reach the specified percentage.

*K9 Bytes*, 56 Misc.3d at 817.  Here, the Agreement contains a reconciliation provision in Section 2:

> The Initial Daily Amount is intended to represent the Specified Percentage of [Debtor's] daily Future Receipts.  For as long as no Event of Default has occurred, once each calendar month, [Debtor] may request, in writing, that [Defendant] adjust the Daily Amount to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . No more often than once a month, [Defendant] may adjust the Daily Amount on a going-forward basis to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

Agreement, p. 2.

Another factor that New York courts look for in determining whether an agreement is a loan is ". . .whether the [buyer] has any recourse should the merchant declare bankruptcy."  *Id*. at 818. Here, the Agreement provides, in relevant part, that ". . . if the full Purchased Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Debtor] has not breached this Agreement, [Debtor] would not owe anything to [Defendant] and would not be in breach or default under this Agreement."  Agreement, Section 4, p. 2.  In addition, in the "Events of Default" section of the Agreement, filing for bankruptcy is not listed as an Event of Default.  Agreement, Section 16, p. 5.

The third factor considered in the loan versus sale of future receivables analysis is whether the transaction provides for a definite term.  *NY Capital Asset Corp.*, 58 Misc.3d 1229(A), at *7. As to this factor, Section 4 begins with the following:

> [Debtor] is selling a portion of a future revenue stream to [Defendant] at a discount, not borrowing money from [Defendant] and is solely for business purposes and not for personal, family or household purchases.  There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Defendant].

Agreement, Section 4, p. 2.   The Agreement also provides for contingent collection on the Purchased Amount solely based upon the Debtor's collection of its future receivables:

> If Future Receipts are remitted more slowly than [Defendant] may have anticipated or projected because [Debtor's] business has slowed down, or if the full Purchased Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Debtor] has not breached this Agreement, [Debtor] would not owe anything to [Defendant] and would not be in breach of or default under this Agreement.  [Defendant] is buying the Purchased Amount of Future Receipts knowing the risks that [Debtor's] business may slow down or fail, and [Defendant] assumes these risks based on [Debtor's] representations, warranties and covenants in this Agreement that are designed to give [Defendant] a reasonable and fair opportunity to receive the benefit of its bargain.

Agreement, Section 4, p.2.

In comparing the terms of the Agreement to other like agreements frequently analyzed by New York courts in the usury context, the Agreement bears all of the hallmarks of a sale of future receivables and not a loan.  There are no circumstances under which Defendant could be assured of repayment because remittance of the Purchased Amount is completely contingent on the Debtor's collection of future receivables.  The source of the repayment is deposited receipts from future transactions; if there are no future transactions, or those transactions occur less frequently than anticipated, Defendant assumes the risk that there will be no receipts and therefore no repayment.

The Debtor attempts to make a textual argument by misquoted language from the "Delivery of Purchased Amount" section of the Agreement and construing that misquoted section with the "Events of Default" and "Remedies" provisions to assert that nonpayment is an Event of Default. The Debtor is correct in that it will be in default if it violates any term or covenant of any other agreement with Defendant or its affiliate.  *See* Agreement, Section 16(e).  The Debtor is also correct that if an Event of Default occurs, Section 17.1 provides that that the full uncollected Purchased Amount will be immediately due and payable. The Debtor is incorrect, however, in its conclusion that the language of Section 1 "Delivery of Purchased Amount" provides that the Debtor is responsible for ensuring that the Daily Amount is always available in its account.  Rather, the actual relevant language of Section 1 on which the Debtor bases its textual argument is this:

> [Debtor] understands that it is responsible for *either* ensuring that the Daily Amount is available in the Account each business day *or* advising [Defendant] prior to each daily withdrawal of a shortage in funds. Otherwise, [Debtor] will be responsible for any fees incurred by [Defendant] resulting from a rejected electronic check or ACH debit attempt, as set forth in Appendix A, and will be in an Event of Default as defined within Section 16.

Agreement, Section 1, p. 2 (emphasis added).  The related Event of Default from Section 16 is not 16(e) as the Debtor asserts; rather, it is 16(i): "[t]he [Debtor] fails to give [Defendant] 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the specific daily amount will not be honored by [Debtor's] bank, and [Debtor] fails to supply all requested documentation and allow for daily monitoring of its bank account."  Agreement, Section 16, p. 5.

When read in full and in conjunction with the applicable Event of Default, it is clear that the language of Section 1 referenced by the Debtor does not result in the Debtor being required to have the Daily Amount in its account at all times.  Rather, Section 1 is really about the Debtor providing

19

notice to Defendant if it has a shortage of funds in its account, and operates to make the Debtor responsible for notifying Defendant of any such shortage.[9]

Further, the related Event of Default in Section 16(i) is conjunctive and would be triggered only when the Debtor failed adhere to both requirements: (i) to give Defendant twenty-four (24) hours' notice that there will be insufficient funds in the Debtor's account; *and* (ii) to supply all requested information to Defendant and allow daily monitoring of its account.  Thus, the Debtor would not be in default under the Agreement simply by failing to give Defendant sufficient notice of insufficient funds in its account; rather, the Debtor would also have to fail to supply Defendant with requested information and prevent Defendant from monitoring its account on a daily basis.

The existence of the Guaranty or the filed UCC-1 financing statement also do not transform the Agreement into a loan.  *See*, e.g., *Rapid Capital Finance, LLC v. Natures Market Corp*., 57 Misc 3d 979, 984-85 (Sup. Ct., Westchester Cnty. 2017)(explaining that execution of a security interest, though it may serve to protect the buyer's ability to collect the underlying obligation, is insufficient alone to establish absolute repayment; *Platinum Rapid Funding Group Ltd. v VIP Limousine Servs., Inc.*, 2016 N.Y. Misc. LEXIS 4131, at *9 (N.Y. Sup. Ct. Oct. 27, 2016)(finding contingent repayment where "[t]he guaranty is no broader than the obligations under the Agreement, and the requirement of payment by the Guarantor is no greater than that of the Merchant.");  *NY Capital Asset Corp.*, *supra*, 58 Misc.3d 1229(A), at *7 (same).

The Guaranty here provides that Ms. Dang "will not be personally liable for any amount due under this Agreement unless [Debtor] commits an Event of Default pursuant to Section 16 of the Purchase and Sale of Future Receivables Agreement."  Guaranty, p. 11.  Such language

---

[9] The Debtor is correct that if the Agreement were structured so that the occurrence of an Event of Default were inevitable, such that all the contingent protections in the Agreement were in reality illusory, the Agreement could be found to be a loan because repayment would no longer be contingent.

demonstrates that the Guaranty is no broader than the scope of the Debtor's obligations under the Agreement and is limited to the same Events of Default contained in the Agreement.  Moreover, the Agreement limits enforcement of the Guaranty and Defendant's security interest in the Debtor's accounts receivable only upon the occurrence of an Event of Default. Thus, the existence of the Guaranty and security interest fail to provide any more assurance of repayment than what the Agreement provides and thereby fail to transform the Agreement into a loan.

Finally, the Debtor's assertion that the Agreement is not a true accounts receivable transaction is irrelevant, as the Agreement clearly and unambiguously provides that it involves the purchase of accounts receivable—not a loan—and does not require unconditional repayment by the Debtor or Ms. Dang.  The Agreement is a valid merchant cash advance agreement upheld by a multitude of New York courts.  The Debtor also represents in the Agreement that it had the opportunity to review the documents with an attorney.  Agreement, Section 14.2, p. 4 ("[Debtor] represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.").   In light of these circumstances, the Debtor was on notice that the Agreement was not a loan and therefore not subject to the law of criminal usury.

As the undisputed terms of the Agreement clearly demonstrate that it is not a loan and therefore not subject to N.Y. Penal Law § 190.40, the RFC Motion is granted as to Count I and the Motion for Summary Judgment is denied as to Count I.

## III. Count II (Unjust Enrichment)

In Count II of the Complaint, the Debtor asserts a claim for unjust enrichment.  The Debtor contends that "[t]here is a lack of adequate remedy under the law" and that "Defendant financially benefitted" at the Debtor's expense under the Agreement.  Compl., ¶¶ 23-24.  The Debtor seeks

restitution in the amount of "at least $123,860.96" plus damages caused by the loss of business to the Debtor. *Id*. at ¶ 24. Nowhere in the Complaint does the debtor cite to any applicable statute or case law to support this Count. The Debtor does also not move summary judgment as to this Count in the Motion for Summary Judgment.

As to Count II, Defendant asserts the following in the RFC Motion:

> 1. (Count II--Unjust Enrichment) GMI received $150,000.00 from RFC. This is undisputed. There is no unjust enrichment, except by GMI.

RFC Mot., p. 10.

As both parties assert that New York law applies to the Agreement, and the Agreement so provides, Count II for unjust enrichment will be analyzed under New York law.[10] To recover for unjust enrichment under New York law, the moving party must show that: "(1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) equity and good conscience require restitution." *In re Moyer Group, Inc.*, 586 B.R. 401, 408 (Bankr. S.D.N.Y. 2018); *see also In re Chin*, 492 B.R. 117, 125-26 (Bankr. E.D.N.Y. 2013) ("[T]o prove an unjust enrichment claim more is required than simply showing that one party received a benefit, that the enrichment must be such that in equity and good conscience its retention would be unjust, and to determine whether there has indeed been unjust enrichment the inquiry must focus on the human setting involved, not merely upon the transaction in isolation.")(internal citation and quotation omitted). Typically, a claim for unjust enrichment—which is itself a quasi-contract claim—arises in the absence of a valid and enforceable contract. *See Moyer Group*, 586 B.R. at 408.

In light of the findings as to Count I *supra*, the Debtor has no claim for unjust enrichment. The Agreement has been found to be valid and enforceable. The Confessed Judgment was obtained by virtue of the Agreement and the Affidavit of Confession of Judgment executed by Ms. Dang

---

[10] The Debtor also asserts in Count VII that New York law applies to its unconscionability claim.

therewith.    Because a valid contract exists, the Debtor cannot state a claim for unjust enrichment under applicable New York law.    Thus, summary judgment is granted in favor of Defendant as to Count II.[11]

## IV. Count III (Avoidance & Recovery of Preferential Transfers)

In Count III of the Complaint, the Debtor asserts that certain transfers related to the Agreement are subject to avoidance pursuant to 11 U.S.C. § 547(b).    Specifically, the Debtor contends that within the 90-day preference period preceding February 14, 2019, the petition date of this bankruptcy case (the "Petition Date"), the Debtor made a transfer in the amount of $35,660.96 to Defendant in the form of a garnishment on December 4, 2018.    The Debtor also asserts that entry of the Confessed Judgment "may have occurred" within the preference period and is "therefore subject to avoidance on [that] basis."    Compl., ¶ 28.

Defendant seeks summary judgment on Count III by arguing that no preferential transfer exists as to the $35,660.96 garnishment because the receivables subject to the garnishment were property of Defendant and not of the Debtor.    Defendant contends that there can be no preferential transfer because the receivables were not property of the Debtor or the bankruptcy estate.    Rather, the receivables were property of Defendant once it paid the contract price under the Agreement.

The Debtor also seeks summary judgment as to Count III regarding the $35,660.96 garnishment.    The Debtor notes that the garnishment occurred on December 4, 2018 (within 90 days of the Petition Date), resulting in a transfer of funds in the amount of $35,660.96 to Defendant. Accordingly, the Debtor contends that it is entitled to avoid and recover this transfer made to Defendant, including pre- and post-judgment interest, pursuant to 11 U.S.C. §§ 547, 550, and 551.

---

[11] Georgia law also provides that an unjust enrichment claim can only be brought in the absence of a valid contract. *See Ceasar v. Wells Fargo Bank, N.A.*, 322 Ga. App. 529, 534, 744 S.E.2d 369 (2013)("Unjust enrichment is an equitable principle that may apply when there is no legal contract between the parties.").

The Debtor also asserts that any filed UCC with a security interest should be avoided and set aside as a result of finding a preferential transfer as to the $35,660.96 garnishment.

Neither party addresses the entry of the Confessed Judgment in their summary judgment motions.  Upon review of the Confessed Judgment, it appears that it was entered and docketed by the New York state court on November 14, 2018.  The bankruptcy case was filed on February 14, 2019, such that the 90-day preference period would begin on November 16, 2018.  Thus, the Confessed Judgment was entered outside of the applicable preference period and therefore cannot form the basis of a preference claim under Section 547(b) in this action.  Accordingly, the RFC Motion is granted as to the Confessed Judgment in Count III.

As to whether the $35,660.96 garnishment constitutes a voidable preferential transfer under Section 547(b), the Court is without sufficient facts to make a determination.  Thus, both parties' motions for summary judgment as to Count III are denied

Other than a statement made by Ms. Dang in her affidavit, no evidence of the $35,660.96 garnishment has been submitted in connection with the pending dispositive motions.  In her affidavit, Ms. Dang states that Defendant obtained $35,660.996 in a garnishment from the Debtor's bank account on December 4, 2019.  Docket No. 30, ¶ 12.  An essential element of the Debtor's Section 547(b) claim is that the garnishment constitutes a "transfer of an interest of the debtor in

property." 11 U.S.C. § 574(b).[12]  Defendant has asserted (without any evidentiary support) that the

receivables that it garnished from the Debtor were conclusively and absolutely its property by virtue

of the Agreement.[13]

Defendant also cites to two cases, *In re C.W. Mining Company*, 530 B.R. 878 (Bankr. D.

Utah 2015) and *In re Southwest Freight Lines, Inc.*, 100 B.R. 551 (D. Kan. 1989) in support of its

proposition that the Debtor has no legal interest in the garnished funds by virtue of the Agreement.[14]

In *C.W. Mining*, the bankruptcy court was applying and interpreting Utah's Uniform Commercial

Code to determine whether certain debtor accounts receivable that were sold by the debtor were

property of the debtor or the bankruptcy estate for the purposes of avoidance by the trustee under

11 U.S.C. § 544.  *C.W. Mining*, 530 B.R. at 885-87.  Interpreting Section 70A–9a–318(1) of Utah's

---

[12] Section 547(b) provides:
> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made–
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if–
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer has not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

[13] Although the issue has not been fully developed by the parties, this does not appear to be correct.  Under the Agreement, Defendant is only entitled to have 5% (the Specified Percentage) of the Debtor's collections conveyed to it daily, with those transfers capped at $210,000 (the Purchased Amount).  That limited claim by Defendant likely leaves the Debtor *some* interest in its receivables, making them property of the estate.  *See* 11 U.S.C. § 541. Defendant's assertion that it owns the Debtor's receivables pursuant to the Agreement is also undercut by the fact that it failed to object to the cash collateral orders entered in the underlying bankruptcy case (Main Bankruptcy Case, Docket Nos. 20 and 39) which enable the Debtor to spend what Defendant asserts is its property during the course of this bankruptcy case.  In failing to object to the entry of any cash collateral orders in the bankruptcy case (despite being noticed with the hearing dates related to each order), Defendant implicitly acknowledged that the Debtor retained some interest in its own receivables, notwithstanding the effect of the Agreement.

[14] Other than having provided the case citations, Defendant does not provide any analysis as to how the cases apply to the facts and circumstances of this case.

UCC, the bankruptcy court found that once the debtor sold its accounts receivable, under Utah's UCC, it had no further or legal equitable interests in same. *Id.* at 886.

In *Southwest Freight Lines*, the issue before the district court was whether the debtor's accounts receivable were property of the estate as of the petition date. *Southwest Freight Lines*, 100 B.R. at 554. In the underlying transaction, the debtor granted the creditor a security interest in its accounts receivables as security for a loan. In addition, the debtor surrendered possession of its accounts to the creditor prior to filing for bankruptcy. *Id*. at 553. Having found no applicable state law on point (the underlying agreement was governed by Illinois law), the district court found that the language of the agreement and the debtor's pre-petition surrender of the subject accounts resulted in the debtor conveying complete ownership of the accounts to the creditor, despite the general proposition that accounts receivable that are assigned to secure a loan are property of the estate. *Id*. at 555-56.

Defendant fails to relate the findings in these two cases to this Adversary Proceeding or cite to any applicable New York law governing sales of accounts receivable and the effect such sales have on the ownership interests of the seller in the context of a Section 547(b) preference claim. The case of *C.W. Mining* was decided on purely state law grounds that are not applicable to this proceeding, nor has Defendant explained why the bankruptcy court's holding would be applicable to this proceeding notwithstanding the difference in applicable law. The case of *Southwest Freight Lines* involved a loan secured by a security interest in the debtor's accounts receivable, which is not the type of transaction at issue here, nor has Defendant explained how the analysis of the transaction in *Southwest Freight Lines* is applicable to a purchase and sale of receivables like the Agreement. Further, the decision in *Southwest Freight Lines* was in part based upon the debtor's voluntary surrender of the accounts pre-petition, a fact that is not present in this case.

26

Other than the Agreement and related UCC-1 financing statement, no evidence has been provided as to who actually owned the funds subject to the garnishment, a fact that is necessary to determine whether the garnishment constitutes a "transfer of an interest of the debtor in property" under 11 U.S.C. § 547(b). It is likely that the Debtor, notwithstanding the Agreement, still retained an interest in the garnished funds as, *inter alia*, Defendant has failed to provide any applicable legal basis under New York law for finding that the Debtor had no legal or equitable interest in the garnished funds. In the absence of any evidence to establish conclusively ownership of the $35,660.96 garnished funds—an essential element for the Debtor's preference claim in Count III, neither party is entitled to summary judgment as to Count III as to the garnished funds.[15]

**V. Count IV (Avoidance & Recovery of Fraudulent Transfers)**

In Count IV of the Complaint, the Debtor seeks to avoid transfers made to Defendant within two (2) years of the Petition Date in the total amount of $123,860.96 under 11 U.S.C. §§ 548(a)(1)(B) and 550. In the RFC Motion as to Count IV, Defendant states the following after noting that all of the other claims asserted in the Complaint are derivative of Count I: "GMI asserts that is [sic] was insolvent on the date of each transaction. The transaction is a purchase, not a loan." RFC Mot., p. 11.

Pursuant to Section 548(a)(1)(B), a debtor-in-possession may avoid a transfer that occurred within two (2) years of the petition date if the debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or

---

[15] In addition, neither party provided the Court material information regarding the garnishment, including when it was filed or responded to, nor did they provide any guidance as to when, under New York law, Defendant might have developed a garnishment lien on the garnished funds, and how that might interact with the preference analysis. Further, neither party provided any analysis of the impact on this Count (in particular, Section 547(b)(5)) of Defendant's lien on the receivables derived from the Agreement and the filed UCC-1.

obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

The Debtor asserts that it transferred to Defendant funds totaling $123,860.96 within two (2) years of the Petition Date (beginning in August 2018 at the inception of the Agreement) during which time the Debtor was insolvent, or that the Debtor intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay such debts as they matured.  The Debtor does not, however, assert in the Complaint any facts that go to the "reasonably equivalent value" element to show that it received less than reasonably equivalent value for the $123,860.96 in transferred funds.   Reasonably equivalent value is analyzed through a three-part test: "(i) whether the debtor received value; (ii) whether the value received was in exchange for the property transferred; and (iii) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012)(citing *Pummill v. Greensfelder, Hemker & Gale* (*In re Richards & Conover Steel, Co*.) 267 B.R. 602, 612 (8th Cir. BAP 2001)).

Here, the facts asserted by the Debtor in the Complaint are that the Debtor received $150,000.00 from Defendant pursuant to the Agreement, and the Debtor has paid a total of $123,860.96 towards the Purchased Amount of $210,000.00.  It appears that the Debtor received reasonably equivalent value for the $123,860.96 in transferred funds to Defendant—that being the

28

"satisfaction or securing of a present or antecedent debt of the debtor. . ."   11 U.S.C. § 548(d)(2)(A)(defining "value" for the purposes of Section 548).   The Debtor asserts that the $123,860.96 in transferred funds were made pursuant to the Agreement to satisfy the Debtor's obligation under same; thus, Debtor has failed to show that it received less than reasonably equivalent value under Section 548(a)(1)(B)(ii)(I).[16]

The Debtor also includes in Count IV mention of fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A),[17] which permits avoidance of transfers of an interest of the Debtor in property made within two (2) years of the petition date with the actual intent to hinder, delay, or defraud the creditors.  However, Count IV is titled "Avoidance and Recovery of Fraudulent Transfers (Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)."   Further, the last paragraph of Count IV only seeks to avoid transfers enumerated in that section pursuant to Sections 548(a)(1)(B) and 550.  Thus, it does not appear that the Debtor actually intends to seek avoidance under the actual fraud theory of 11 U.S.C. § 548(a)(1)(A) in Count IV.

However, to the extent the Debtor does seek avoidance on an actual fraud theory of Section 548(a)(1)(A), the Complaint fails to state such a claim under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *In re Medici*, 524 B.R. 902, 905 (Bankr. N.D. Ga. 2014). Rule 9(b) is satisfied where the complaint "alerts the defendant to the precise misconduct with which they are charged."  *Id*. (internal citation and quotations omitted).  Although direct proof of an actual intent to hinder, delay, or defraud creditors is not required, a plaintiff "may plead

---

[16] The Debtor does not assert in the Complaint that the entire Agreement is a fraudulent transfer (i.e., that entering into an agreement to get $150,000.00 now in exchange for $210,000.00 to be paid a short time in the future is itself a fraudulent transfer, as $150,000.00 may not be "reasonably equivalent value" for $210,000.00).

[17] Section 548(a)(1)(A) provides that the "trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted[.]"

circumstantial evidence from which the court may infer intent." *In re Siskey Hauling Co., Inc.*, 2011 WL 1519969, at *3 (Bankr. N.D. Ga. Jan. 6, 2011).   In the Eleventh Circuit, circumstantial evidence upon which courts may infer actual fraudulent intent are known as "badges of fraud," and include the following:

> 1) The transfer was to an insider;
>
> 2) The debtor retained possession or control of the property transferred after the transfer;
>
> 3) The transfer was disclosed or concealed;
>
> 4) Before the transfer was made the debtor had been sued or threatened with suit;
>
> 5) The transfer was of substantially all the debtor's assets;
>
> 6) The debtor absconded;
>
> 7) The debtor removed or concealed assets;
>
> 8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
>
> 9) The debtor was insolvent or became insolvent shortly after the transfer was made;
>
> 10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> 11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id*. (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998)).  In assessing the badges of fraud and whether sufficient circumstances exist to infer actual intent, "[s]howing only one badge of fraud may be insufficient to establish intent, but a confluence of several can constitute conclusive evidence of an actual intent to defraud."   *In re White*, 559 B.R. 787, 806 (Bankr. N.D. Ga. 2016)(quoting *In re LendXFinancial, LLC,* 2012 WL 1597394, at *5 (Bankr. N.D. Ga. Mar. 19, 2012))(internal quotation omitted).

As to the fraudulent transfer identified in the Complaint under Count IV (the $123,860.96 in funds paid by the Debtor to Defendant since August 2018), the only applicable badges of fraud that have been pled by the Debtor are the reasonably equivalent value (as explained *supra*) and insolvency badges.  These badges alone, however, fail to rise to the level of actual fraud.  The totality of the circumstances surrounding the transfer of $123,860.96 to Defendant pursuant to the Agreement and a garnishment fall short of demonstrating circumstances upon which the Court can infer that that the Debtor intended to hinder, delay, and defraud its other creditors in transferring such funds.

For the reasons set forth above, the RFC Motion as to Count IV is granted.

## VI. Count V (Claim to Determine Validity, Priority, or Extent of Security Interests)

In Count V of the Complaint, the Debtor seeks a declaration that Defendant has no security interest in property of the Debtor by virtue of the Confessed Judgment or UCC-1 financing statement because the underlying Agreement is criminally usurious and void *ab initio*.  The Debtor contends that upon the Agreement being declared void *ab initio*, there is no debt upon which Defendant's security interest or Confessed Judgment can attach, resulting Defendant having a secured claim in the amount of $0.00.

Defendant asserts, as to Count V, that because the Agreement is not a loan and therefore not subject to criminal usury law, and because Defendant has a perfected security interest in the Debtor's receivables, there is no basis for the Court to determine that Defendant is not secured.

Count V is entirely derivative of Count I for criminal usury, as the only basis the Debtor seeks a determination of the validity, priority, and extent of Defendant's security interest is grounded in its assertion that the underlying Agreement is a criminally usurious loan.  In light of the findings *supra* that the Agreement is not a loan, the Debtor has no basis to assert Count V.

Accordingly, the RFC Motion as to Count V is granted.

**VII. Count VI (Claims Issues)**

In Count VI of the Complaint, the Debtor asserts an objection to Defendant's Proof of Claim.  The Debtor seeks disallowance of Defendant's claim on various theories, including 11 U.S.C. § 502(b)(1) on the ground that the Agreement is unenforceable under applicable New York law because it is a criminally usurious loan.  The Debtor also seeks disallowance of Defendant's claim under 11 U.S.C. § 502(d) on the basis that Defendant is a transferee of an avoidable transfer under 11 U.S.C. § 547 and that Defendant is an entity from which property is recoverable pursuant to 11 U.S.C. § 553.

Defendant asserts that, as to Count VI, that the Agreement is not a loan under applicable New York law, and therefore cannot be usurious and is not objectionable on that basis.

Although the Debtor's ability to object to Defendant's claim based upon the Agreement constituting a criminally usurious loan is foreclosed by the Court's findings as to Count I, whether the Debtor has grounds to object to Defendant's claim under Section 547 is still outstanding because the Court has denied both parties' motions for summary judgment as to Count III for avoidance of preferential transfers under Section 547(b).  Accordingly, the Debtor may have a viable basis to object to Defendant's claim pursuant to Section 547(b) depending on the outcome of Count III.

Further, the Debtor also appears to dispute the amount of Defendant's claim filed in the underlying bankruptcy case in light of allegations asserted herein but not specifically delineated and identified in Count VI.  Specifically, the Debtor asserts in the Complaint that, in addition to the $77,000.00 in payments made under the Agreement, the Debtor made additional payments in the amount of $11,200.00, and that Defendant garnished the Debtor's accounts in the amount of

$35,660.96.  Accordingly, the Debtor asserts that it made a total of $123,860.96 in payments under the Agreement; however, Defendant's claim filed in the main bankruptcy case is in the amount of $143,831.70, supported by the Confessed Judgment which only includes $77,000.00 of payments received from the Debtor.

In light of the foregoing, the RFC Motion as to Count VI is denied.  In addition, the Debtor has 30 days from the date of entry of this Order to amend Count VI of the Complaint to object to Defendant's claim on the ground that it reflects an incorrect balance owed under the Agreement based on the additional payments identified in the Complaint.

## VIII. Count VII (Unconscionability)

The Debtor asserts in Count VII that the Agreement and related documents (the Guaranty and UCC-1 financing statement) are together procedurally and substantively unconscionable under N.Y. Uniform Commercial Code § 2-302[18] and therefore should not be enforced against the Debtor.

Defendant seeks summary judgment as to Count VII, arguing that the Debtor has failed to set forth any law or facts to support a claim for unconscionability.  To the contrary, Defendant asserts that the facts demonstrate that the Debtor has acted in bad faith, particularly by representing that it was solvent when it sold its receivables to Defendant.

A contract is unconscionable under New York law when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be

---

[18] N.Y. UCC 2-302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

unenforceable according to its literal terms." *In re Residential Capital, LLC*, 531 B.R. 25, 48

(Bankr. S.D.N.Y. 2015) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537

N.Y.S.2d 787, 534 N.E.2d 824 (1988))(internal quotations omitted).    Proof that a contract is

unconscionable    requires    satisfaction    of    two    elements:    procedural    and    substantive

unconscionability.    *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *11 (Bankr. S.D.N.Y. Dec.

1, 2016).  Procedural and substantive unconscionability are defined as follows:

> Procedural unconscionability arises when there was a lack of meaningful choice
> arising from the contract formation process, in light of the circumstances of the
> transaction and the sophistication and bargaining power of the parties.
>
> In determining if a provision is substantively unconscionable, a court must examine
> the substance of the bargain to determine whether the terms were unreasonably
> favorable to one party in light of their commercial context, their purpose, and their
> effect.

*Id*. (internal citation and quotation omitted).

Satisfaction of both elements, however, is not always necessary; in "'exceptional cases'

courts have found that 'a provision of the contract is so outrageous as to warrant holding it

unenforceable on the ground of substantive unconscionability alone.'"  *Residential Capital*, 531

B.R. at 49 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 12, 537 N.Y.S.2d 787,

534 N.E.2d 824 (1988)).

In addition, commercial contracts between businesses are generally presumed to be

conscionable.  *BH Sutton*, 2016 WL 8352445, at *12 (explaining that "[w]hen the contract is

between two commercial entities, unconscionability must be viewed in light of the general

commercial background and the commercial needs of the particular trade or case, and there is a

presumption of conscionability when the contract is between business in a commercial setting.

Courts have rarely found a clause to be unconscionable in a commercial contract.") (internal citation

and quotation omitted).

34

Here, the Agreement is afforded the presumption of conscionability because it was executed between two commercial entities.[19]   The Debtor has failed to demonstrate any facts or circumstances sufficient to overcome such a presumption.   Further, the Agreement is neither procedurally nor substantively unconscionable under applicable New York law.

In terms of procedural unconscionability, the facts set forth by the Debtor fail to indicate unconscionability in the formation process or a lack of meaningful choice on behalf of the Debtor. Although the Debtor's principal contends that she believed the Agreement to be to a loan, such a mistaken belief does not constitute procedural unconscionability, especially where the Agreement clearly and unambiguously provides that it is not a loan, but rather a sale and purchase of the Debtor's future receivables. *See* Agreement, p. 1 ("Agreement for the Purchase and Sale of Future Receivables); p. 2 ("Sale of Future Receipts (THIS IS NOT A LOAN)"); p. 2 ("[Debtor] is selling a portion of a future revenue stream to [Defendant] at a discount, not borrowing money from [Defendant}. . ."). There are also no facts that establish a significant discrepancy in the bargaining power of the parties. Instead, the evidence shows that the Debtor is a sophisticated corporation that provides janitorial services throughout the Southeastern United States and is not unfamiliar with various forms of commercial financing.[20]   There are no facts to suggest that the Debtor lacked sufficient experience and commercial sophistication as compared to Defendant. Accordingly, the Agreement is not procedurally unconscionable.

The terms and effect of the Agreement also fail the substantive unconscionability element for the reasons set forth *supra* in Section II(b). Contrary to the Debtor's characterizations of the Agreement and insistence that it is a criminally usurious loan, the Agreement is in fact a valid

---

[19] In Section 14.2 of the Agreement, the Debtor represented and warranted that it is a sophisticated business entity familiar with the kind of transaction encompassed by the Agreement.  Agreement, p. 4.

[20] *Id*. at fn.19.

merchant cash advance agreement under applicable New York law. *See N.Y. Capital Asset Corp.*, *supra*, 58 Misc.3d 1229(A), at *6 (N.Y. Sup. Ct. March 8, 2018)(" Importantly, purchases and sales of future receivables and sales proceeds. . . are common commercial transactions expressly contemplated by the Uniform Commercial Code.")(citing cases).

As to the terms of the Agreement and whether they are unreasonably favorable to one party over the other, the Agreement does not provide Defendant with the right of absolute repayment of the Purchased Amount, but rather enables Defendant to collect the Purchased Amount solely on a contingent basis dependent on the Debtor's collection of future receivables.  Such terms result in material risk to Defendant's ability to collect under the Agreement.  The contingent nature of Defendant's right to repayment under the Agreement certainly falls short of being "unreasonably favorable" to Defendant.  Consequently, the Agreement also fails to satisfy the substantive unconscionability prong under New York law.

As the Agreement is neither procedurally nor substantively unconscionable, the RFC Motion as to Count VII is granted.

## CONCLUSION

Upon consideration of the Complaint, RFC Motion, Motion for Summary Judgment, and other related pleadings filed in this Adversary Proceeding, it is hereby

**ORDERED** that the RFC Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

The RFC Motion is granted as to Count I, Count II, Count III (as to the Confessed Judgment) Count IV, Count V, and Count VII.  The Motion is denied as to Count III (as to the garnished funds) and Count VI.  And it is further

**ORDERED** that the Motion for Summary Judgment is **DENIED** in its entirety as to both

Count I and Count III.  And it is further

**ORDERED** that the Debtor shall have **30 days** from the date of entry of this Order to amend

the Complaint as to Count III and Count VI to replead the claims asserted therein as provided *supra*.

The Clerk is directed to serve a copy of this Order upon the Debtor, counsel for the Debtor,

Defendant, and counsel for Defendant.

**[END OF DOCUMENT]**